**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION**

RES DEVELOPMENT CORPORATION,

        Plaintiff,

vs.                                                Case No. 5:09-CV-491-Oc-32GRJ

MOMENTIVE PERFORMANCE
MATERIALS INC.,

        Defendant.

---

**ORDER**

Plaintiff RES Development Corporation ("RES") filed this lawsuit against defendant Momentive Performance Materials, Inc. ("Momentive"), alleging that certain Momentive products infringe U.S. Patent No. 6,841,602, entitled "Thermoset Polymers With Polyflouroalkylsiloxane Modified Surfaces" (the "'602 patent"). This matter is before the Court for patent claim construction, as described in Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995)(en banc), aff'd, 517 U.S. 370 (1996). The Court has considered the submissions of the parties, including the memoranda and exhibits (Docs. 22, 24, 25, 28), as well as the argument of counsel at the December 21, 2010, Markman hearing (Doc. 32).

**I.    Claim Construction Standards**

Patent claims are construed by the Court as a matter of law. Cybor Corp. v. FAS Techs, Inc., 138 F.3d 1448, 1454-56 (Fed. Cir. 1998)(en banc). However, a Court need construe "only those terms . . . that are in controversy, and only to the extent necessary to

resolve the controversy." Vivid Techs., Inc. v. American Science & Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999).

In claim construction, courts first examine the patent's intrinsic evidence to define the patented invention's scope. See Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005)(en banc). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. See Phillips, 415 F.3d at 1314; C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 861 (Fed. Cir. 2004).

Claim construction begins with the words of the claims themselves. Amgen Inc. v. Hoechst Marion Roussel, Inc., 457 F.3d 1293, 1301 (Fed. Cir. 2006); Phillips, 415 F.3d at 1312. "[T]he words of a claim 'are generally given their ordinary and customary meaning.'" Phillips, 415 F.3d at 1312 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Such ordinary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Id at 1313.

A "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Phillips, 415 F.3d at 1313. Accordingly, "the specification is always highly relevant to the claim construction analysis." Id. at 1315 (quotation omitted). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. Id. at 1316.

"[W]hile claims are to be interpreted in light of the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be

read into the claims." Comark Commc'ns, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998) (quoting Sjolund v. Musland, 847 F.2d 1573, 1581 (Fed. Cir.1988)).  Importing limitations from the specification therefore "should be avoided unless the patentee clearly 'intends for the claims and the embodiments in the specification to be strictly coextensive.'" Pfizer, Inc. v. Ranbaxy Labs. Ltd., 457 F.3d 1284, 1290 (Fed. Cir. 2006) (quoting Phillips, 415 F.3d at 1323).  The Federal Circuit has thus explained that "when a claim term is expressed in general descriptive words, we will not ordinarily limit the term to a numerical range that may appear in the written description or in other claims.  Nor may we, in the broader situation, add a narrowing modifier before an otherwise general term that stands unmodified in a claim." Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1249-50 (Fed. Cir. 1998) (internal citation omitted).

Although intrinsic evidence is preferred, courts may also rely on extrinsic evidence, which is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms.  A court should use care when relying on such sources, however, since they may provide definitions that are too broad or may not be indicative of how the term is used in the patent.  Phillips, 415 F.3d at 1321-22.

**II.    The Claims**

RES contends that Momentive infringes Claims 4, 8, and 11 of the '602 Patent. Because the disputed terms in Claims 8 and 11 are the same or very similar to the disputed terms in Claim 4, the Court can resolve all outstanding claim interpretation issues by

construing the terms of Claim 4.

Claim 4 of the '602 Patent reads as follows (with emphasis on the disputed claim terms and phrases):

> A method of forming a composition of matter comprising <u>a cross-linked thermoset resin</u> and from about 0.01 to 5%, by weight of an additive comprising a polyfluoroalkylsiloxane, <u>said additive having a lower surface energy than that of said resin</u>; said method comprising <u>intimately admixing</u> with a <u>cross-linkable thermosetting resin</u> providing composition (I) a polyfluoroalkylsiloxane having the formula:

$$R_2-\underset{\underset{R_3}{|}}{\overset{\overset{R_1}{|}}{Si}}-O-\left[\underset{\underset{R_7}{|}}{\overset{\overset{\overset{\overset{CF_3}{|}}{(CH_2)_m}}{|}}{Si}}-O\right]_n\underset{\underset{R_6}{|}}{\overset{\overset{R_4}{|}}{Si}}-R_5$$

> wherein R1, R2, R3, R4, R5, R6, and R7 may be the same or different and may be alkyl, cycloalkyl or aryl; R7 may also be -(CH2)m-CF3; m is an integer from 0 to 20, and n is an integer from 1 to 5,000; or a silanol terminated derivative of said polyfluoroalkylsiloxane or a copolymer of said polyfluoroalkylsiloxane; followed by subjecting said mixture to <u>conditions which produce a cross-linked, thermoset solid resin</u> wherein the <u>concentration of said additive thorough [sic] a cross-section of said composition is lower in the interior thereof and higher at the surfaces thereof</u>.

('602 patent col.5 ll.60 to col.6 ll.22.)

### III. **Claim Construction**

#### A. **Cross-Linked Thermoset Resin**

| **RES's Proposed Construction** | **Momentive's Proposed Construction** |
|---|---|
| A prepolymer that has been irreversibly cross-linked by curing into an infusible and insoluble polymer. (Doc. 22 at 5.) | A type of polymer that has changed irreversibly under the influence of heat from a fusible and soluble material into one which is infusible and insoluble and where the final stages of polymerization occur simultaneously with cross-linking regardless of the amount of heat that is applied. (Doc. 24 at 8.) |

The principal dispute between the parties is whether the term "cross-linked thermoset resin" should be defined as a polymer that has been cured under the influence of heat.[1] Because there is no intrinsic evidence relevant to this term, both parties rely solely on extrinsic evidence.

RES first cites to the International Union of Pure and Applied Chemistry's Compendium of Chemical Terminology (2007) (the "Compendium"). (Doc. 22-2 at 1.) This technical dictionary defines a thermosetting polymer as a "[p]repolymer in a soft solid or viscous state that changes irreversibly into an infusible, insoluble polymer network by curing." The notes to the definition provide that "[c]uring can be induced by the action of heat or suitable radiation, or both." (Id.)

Both parties also rely on Fred W. Billmeyer, Jr.'s Textbook of Polymer Science (3d ed. 1984). This textbook provides: "Thermosetting resins are those that change irreversibly under the influence of heat . . . ." It also states, however, that "[i]n some of the systems considered in this chapter [on thermosetting resins], network formation occurs with little or

---

[1] At the hearing, RES agreed to the following language from Momentive's proposed construction: "where the final stages of polymerization occur simultaneously with cross-linking regardless of the amount of heat that is applied."

no heat required, as in the production of urethane foams and the use of unsaturated polyester resins." (Doc. 25-7 at 4.)[2] This textbook thus suggests that, while thermoset resins may ordinarily be cured with heat, other methods can also be employed.

Momentive further relies on a literal translation of the word "thermoset." Because the prefix "thermo" means heat, Momentive contends that "thermoset" means "set by heat." (Doc. 24 at 9.)

The Court finds that the term "cross-linked thermoset resin" does not necessarily refer to a "polymer that has changed irreversibly under the influence of heat." Although a literal translation of the term "thermoset" may support Momentive's position, the relevant inquiry is "the meaning that the term would have to a person of ordinary skill in the art." Phillips, 415 F.3d at 1313. The sources discussed above indicate that the term is used in the field of polymer science to include resins that are also cured by means other than heat.[3]

---

[2] At the hearing, Momentive argued that, although this sentence referred to systems discussed in the chapter entitled "Thermosetting Resins," such systems were not actually thermosetting resins. The Court has found no support for this argument in the record. In fact, Billmeyer appears to go on to classify "unsaturated polyester resins" and "urethane foams," the polymers identified as curable with little or no heat, as thermosetting resins. (Doc. 25-7 at 10, 13-14.)

[3] Momentive suggested for the first time at the hearing that the Compendium's definition of a "thermosetting polymer" is not relevant to the construction of the term "thermosetting resin." Momentive apparently contends that while a thermosetting polymer can be cured by means other than heat, this is not the case with a thermosetting resin. RES, however, argued at the hearing that, at least with respect to this issue, there is no material difference between the two terms. Although the record made available to the Court does not speak directly to this issue, the information filed by the parties leads the Court to assume that the definition of a "thermosetting polymer" is helpful in construing the term "thermosetting resin." Even if this were not the case, however, the Court would still reach the same conclusion based on the excerpts filed from Billmeyer's textbook.

The Court therefore construes the phrase "cross-linked thermoset resin" as: "A prepolymer that has been irreversibly cross-linked by curing into an infusible and insoluble polymer where the final stages of polymerization occur simultaneously with cross-linking regardless of the amount of heat that is applied."

### B. Said Additive Having A Lower Surface Energy Than That Of Said Resin

| RES's Proposed Construction | Momentive's Proposed Construction |
| --- | --- |
| The polyfluoroalkylsiloxane additive has a surface energy lower than that of the thermoset resin. (Doc. 22 at 6.) | The surface energy of the cross-linked thermoset resin is more than about 5 dynes/cm higher than the surface energy of the additive. (Doc. 24 at 10.) |

Momentive argues that "[s]ince the only disclosure in the '602 patent regarding the 'surface energy' limitation states that the difference in the surface energy . . . is 'about 5 dynes/cm,' the Court should include that feature of the invention in its construction of this claim term." (Doc. 24 at 10.) Specifically, the '602 Patent specification provides: "Generally, it is preferred that the additive have a lower surface energy, by more than about 5 dynes/cm, as compared with the polymer with which it is compounded." ('602 patent, col.4 ll.55-57.)

The evidence presented by Momentive does not indicate that the patentee intended for the claim and limitation quoted above to be "strictly coextensive." Phillips, 415 F.3d at 1323. The specification does not imply that the invention is limited to situations where the additive has a surface energy that is about 5 dynes/cm lower than the polymer with which it is compounded; instead, the specification states that "[g]enerally, it is preferred" that this will be the case. A person of ordinary skill in the art thus would not interpret the phrase "additive having a lower surface energy than that of said resin" as an additive having a

surface energy that is by definition about 5 dynes/cm lower than that of the thermosetting resin.

The construction proposed by RES, however, does nothing more than restate the language of the claim. The Court therefore declines to further construe the phrase "<u>said additive having a lower surface energy than that of said resin</u>."

### C. Intimately Admixing

Although the parties initially identified this term as being disputed, Momentive has withdrawn its construction and stipulated to the construction proposed by RES. (Doc. 24 at 12.) The term "<u>intimately admixing</u>" is thus construed as follows: "Ensuring that the additive is uniformly dispersed throughout the cross-linkable thermosetting resin composition." (Doc. 22 at 7.)

### D. Cross-Linkable Thermosetting Resin

| RES's Proposed Construction | Momentive's Proposed Construction |
|---|---|
| A prepolymer composition capable of being irreversibly cross-linked by curing into an infusible and insoluble polymer. (Doc. 22 at 8.) | A type of polymer capable of being changed irreversibly under the influence of heat from a fusible and soluble material into one which is infusible and insoluble and where the final stages of polymerization occur simultaneously with the cross-linking regardless of the amount of heat that is applied. (Doc. 24 at 12.) |

The parties acknowledge that the term "cross-linkable thermosetting resin" is very similar to the term "cross-linked thermoset resin," and thus advance nearly identical constructions. (Docs. 24 at 12; 28 at 4.) For the reasons discussed above, the Court finds that the term "cross-linkable thermosetting resin" is not limited to a polymer that is capable

of being changed under the influence of heat.

The Court therefore construes the phrase "cross-linkable thermosetting resin" as: "A prepolymer composition capable of being irreversibly cross-linked by curing into an infusible and insoluble polymer where the final stages of polymerization occur simultaneously with cross-linking regardless of the amount of heat that is applied."

### E.   Conditions Which Produce A Cross-Linked, Thermoset Solid Resin

Although this term was also initially identified as being disputed, Momentive has withdrawn its construction and stipulated to the construction proposed by RES. (Doc. 24 at 13-14.) The term "conditions which produce a cross-linked, thermoset solid resin" is thus construed as follows: "Any condition(s) that causes the thermosettable resin forming mixture to cross-link and to form a solid, thermoset resin." (Doc. 22 at 5.)

### F.   Concentration Of Said Additive Thorough [sic] A Cross-Section Of Said Composition Is Lower In The Interior Thereof And Higher At The Surfaces Thereof

| RES's Proposed Construction | Momentive's Proposed Construction |
|---|---|
| A higher concentration of the additive is found at the surface of the composition with a lower concentration in the interior of the composition. (Doc. 22 at 10.) | A much higher concentration of the additive is found at the surface of the composition with a much smaller amount in the interior or bulk of the composition. (Doc. 24 at 14.) |

Momentive supports its construction with the following language from the specification: "typically a much higher concentration of the additive is found at the surfaces of the composition with a much smaller amount in the interior or bulk of the polymer." (602' patent col. 3, ll. 36-39.) Momentive also notes that identical language was presented to the

United States Patent & Trademark Office during the prosecution of the '602 patent.  (Doc. 24 at 14-15; see Doc. 25-8 at 76.)

The intrinsic evidence relating to this term does not suggest that the patentee intended for the language found in the specification to be "strictly coextensive" with the claims.  <u>Phillips</u>, 415 F.3d at 1323.  The specification provides that "typically" a much higher concentration is found at the surface; it does not indicate that the invention is limited to such situations.  The Court thus declines to "add a narrowing modifier before an otherwise general term that stands unmodified in a claim."  <u>Renishaw PLC</u>, 158 F.3d at 1249.[4]

Because the construction proposed by RES again does nothing more than restate the language of the claim, the Court declines to further construe the phrase: "<u>concentration of said additive through a cross-section of said composition is lower in the interior thereof and higher at the surfaces thereof</u>."[5]

## IV.  **Conclusion**

In summary, the Court's constructions are as follows:

1. "cross-linked thermoset resin"

---

[4] The same reasoning applies with even more force to the prosecution history cited by Momentive, which contains language identical to that found in the specification.  This is because a statement contained in the prosecution history will narrow the scope of a claim only when the patentee makes "a clear and unmistakable disavowal of scope during prosecution."  <u>Pudue Pharma L.P. v. Endo Pharm. Inc.</u>, 438 F.3d 1123, 1136 (Fed. Cir. 2006).

[5] The Court acknowledges that, as was discussed at the hearing, there is some level of imprecision in the language of the claim.  Momentive's proposed construction, however, would only make the phrase even less precise.

> A prepolymer that has been irreversibly cross-linked by curing into an infusible and insoluble polymer where the final stages of polymerization occur simultaneously with cross-linking regardless of the amount of heat that is applied.

2. "said additive having a lower surface energy than that of said resin"

> No further construction needed.

3. "intimately admixing"

> Ensuring that the additive is uniformly dispersed throughout the cross-linkable thermosetting resin composition.

4. "cross-linkable thermosetting resin"

> A prepolymer composition capable of being irreversibly cross-linked by curing into an infusible and insoluble polymer where the final stages of polymerization occur simultaneously with cross-linking regardless of the amount of heat that is applied.

5. "conditions which produce a cross-linked, thermoset solid resin"

> Any condition(s) that causes the thermosettable resin forming mixture to cross-link and to form a solid, thermoset resin.

6. "concentration of said additive through a cross-section of said composition is lower in the interior thereof and higher at the surfaces thereof"

> No further construction needed.

Accordingly, it is hereby

**ORDERED**:

1. Absent further Order, further proceedings will be consistent with this Order.

2. The parties will file their proposed case management schedule by **January 7, 2011**.

**DONE AND ORDERED** at Jacksonville, Florida this 3rd day of January, 2011.

_____
TIMOTHY J. CORRIGAN
United States District Judge

js.
Copies:

counsel of record